FILED
IN CLERKS OFFICE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS** 2025 FEB 27 PM 1: 34

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| MIKHAEL EL-BAYEH ) | Case No. 1:25-cv- |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| MASSACHUSETTS DEPARTMENT ) | |
| OF STATE POLICE; MICHAEL P. ) | |
| SIERRA, IN HIS INDIVIDUAL ) | |
| CAPACITY AND OFFICIAL CAPACITY ) | |
| AS A UNIFORMED MEMBER OF THE ) | |
| MASSACHUSETTS DEPARTMENT OF ) | |
| STATE POLICE; COLLEEN OGILVIE, ) | |
| IN HER OFFICIAL CAPACITY AS ) | |
| REGISTRAR OF MOTOR VEHICLES; ) | |
| MARIAN T. RYAN, IN HER OFFICIAL ) | |
| CAPACITY AS MIDDLESEX COUNTY ) | |
| DISTRICT ATTORNEY ) | |
| ) | |
| *Defendants*. ) | |

## INTRODUCTION

1. The Equal Protection Clause of the Fourteenth Amendment to the United

   States Constitution provides "[n]o State shall . . . deny to any person within

   its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, §

   1.

- 1 -

2.  Under this constitutional provision, government officials have a duty to treat similarly situated individuals alike, and a duty not to abuse the privilege of public service to grant, withhold, solicit, or receive corrupt favor.

3.  Each day, police officers in the Commonwealth make thousands of contacts with motorists suspected of civil traffic violations.  Each of these police officers is vested with complete discretion in deciding to conclude these encounters with a warning or citation.

4.  These decisions receive little or no official oversight, and while there is nothing untoward in the majority of instances where this discretion is exercised in a manner consistent with the public interest, this discretion is also subject to abuse that—until recently—has been difficult to detect and address.

5.  With the rapid proliferation of body worn cameras, a new era of police oversight and accountability has begun, where every citizen can now participate by claiming their right to obtain a raw chronicle of these routine encounters—upright and otherwise.

6.  The so-obtained footage of the encounters in this case is a fruit of this revolution in citizen surveillance, illustrating its potential for a fuller realization of equal protection by showing that no corrupt act is too small, too furtive, or too fleeting to escape notice or evade justice.

- 2 -

## JURISDICTION AND VENUE

7.  This action is filed under 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. §§ 2201(a) and 2202.

8.  This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3).

9.  This Court is proper venue under 28 U.S.C. § 1391 because Defendants reside within the District and the events giving rise to Plaintiff's claims occurred within the District.

10. The Eastern Division of this Court is appropriate under Local Rule 40.l(d)(l)(A) because all parties residing in the District reside in the Eastern Division.

## PARTIES

11. Plaintiff Mikhael El-Bayeh is a natural person and private citizen who has been duly licensed to operate motor vehicles by the Commonwealth of Massachusetts since 2004. El-Bayeh resides in Woburn, Massachusetts.

12. Defendant Massachusetts Department of State Police ("MSP") is a department within the Executive Office of Public Safety and Security as established under G. L. c. 22C, § 2. MSP's principal place of business (General Headquarters) is at 470 Worcester Road, Framingham, Massachusetts.

13. Defendant Michael P. Sierra is a uniformed member of MSP with MSP-assigned identification number 4398. Sierra has been a State Trooper since on or about June 27, 2019. Sierra is being sued in his individual capacity and his official capacity. Sierra resides in Peabody, Massachusetts.

14. Defendant Colleen Ogilvie is the administrator ("Registrar") of the Registry of Motor Vehicles ("RMV") as established under G. L. c. 6C, § 56. Ogilvie has been Registrar since on or about January 21, 2021. Ogilvie is being sued in her official capacity. The RMV's principal place of business is at 25 Newport Avenue Extension, Quincy, Massachusetts.

15. Defendant Marian T. Ryan is the District Attorney for Middlesex County as established under G. L. c. 12, § 12. Ryan has been District Attorney since on or about April 29, 2013. Ryan is being sued in her official capacity. The District Attorney's principal place of business is at 15 Commonwealth Avenue, Woburn, Massachusetts.

## FACTUAL ALLEGATIONS AND INJURIES TO PLAINTIFF

### El-Bayeh's Traffic Stop, Enforcement Action, and Continuing Prosecution

16. On August 4, 2021 at approximately 6:38 P.M., El-Bayeh was operating his motor vehicle on U.S. Route 3 in Burlington when Trooper Sierra activated his cruiser's blue lights and sirens and stopped El-Bayeh's vehicle.

17. Trooper Sierra approached the driver's side window of El-Bayeh's vehicle, at which point El-Bayeh requested to know why he was being stopped.

18. Trooper Sierra informed El-Bayeh that he was being stopped for speeding because he believed El-Bayeh was driving seventy-two miles per hour in a fifty-five mile per hour zone.

19. Trooper Sierra did not advise El-Bayeh as to whether or not he was being recorded at any point during the traffic stop.

20. El-Bayeh later learned that he was in fact being video and audio recorded during the traffic stop.

21. At or around the time of the stop, Trooper Sierra came to believe that he had developed probable cause that El-Bayeh had committed a speeding offense in violation of G. L. c. 90, § 17.

22. Assuming for pleading purposes that Trooper Sierra's subjective belief that he had developed probable cause was objectively true, Trooper Sierra then had the sole prosecutorial discretion to charge El-Bayeh with a speeding offense or release him with a warning.

23. Trooper Sierra elected to charge El-Bayeh with a speeding offense, alleging seventy-two miles per hour in a fifty-five mile per hour zone.

24. Trooper Sierra elected to continue the prosecution of El-Bayeh throughout the subsequent proceedings in state court in his capacity as police prosecutor.

25. El-Bayeh is a civilian and is not and has never been a member of law enforcement or a fire department.

26. At no point during or after the traffic stop did El-Bayeh represent to Trooper Sierra or otherwise cause Trooper Sierra to believe that he was affiliated with a governmental entity.

27. No adjudicative process occurred before Sierra charged El-Bayeh and in doing so made a claim against him for the $175 scheduled assessment, which would have become final and payable within twenty days without any further action or adjudicative process.

28. Upon such payment or failure to pay within the allowed time, collateral administrative penalties or other adverse actions against El-Bayeh would have also taken effect without any further action or adjudicative process, including, but not limited to, the entry of a surchargeable incident into El-Bayeh's operator record that would have caused his state-regulated automobile insurance premiums to increase.

**Comparator 1 – Snow's Traffic Stop and Warning**

29. On March 30, 2022 at approximately 11:01 P.M., Daniel J. Snow was operating his motor vehicle on U.S. Route 3 in Bedford when Trooper Sierra activated his cruiser's blue lights and sirens and stopped Snow's vehicle.

30. The entire traffic stop was recorded by Trooper Sierra's body worn camera ("BWC") and cruiser mounted camera ("CMC").

31. In connection with a related state court filing discussed *infra*, the BWC footage was uploaded to YouTube where it remains available to view as of the submission date of this Complaint at URL https://youtu.be/C2qVqxZ4xRc.

32. After effectuating the traffic stop, Trooper Sierra exited his cruiser and approached the driver's side window of Snow's vehicle.

33. Once he reached Snow's vehicle, Trooper Sierra illuminated the large "MIDDLESEX SHERIFF'S OFFICE" patch on Snow's left jacket sleeve with his flashlight.

34. This observation caused Trooper Sierra to believe that Snow was affiliated with law enforcement.

35. At the time of the stop, Snow was in fact employed by the Middlesex County Sheriff's Office as a Correction Officer.

36. Trooper Sierra stated to Snow: "Ninety-five is why we're here you know that, right?  Miles an hour?"

37. Snow nodded in acknowledgment.

38. Trooper Sierra stated: "Heads up, this is being recorded on body camera."

39. Snow provided his documents to Trooper Sierra.  Trooper Sierra then returned to his cruiser.

40. After generating and printing the written warning, Trooper Sierra returned to Snow.  Trooper Sierra quickly handed Snow his items and stated: "Alright, here's your stuff back. You're all set to go."

41. Trooper Sierra immediately turned about-face and returned to his cruiser.

42. At no point during the stop did Snow offer a reason or excuse for driving ninety-five miles per hour, nor was any apparent.

43. At no point during the stop did Trooper Sierra ask Snow why he was driving ninety-five miles per hour or admonish him for doing so.

44. Trooper Sierra had the sole prosecutorial discretion to charge Snow with a speeding offense or release him with a warning based on his belief that he had developed probable cause.

45. Trooper Sierra elected to release Snow with a warning.

46. Trooper Sierra falsely marked sixty-five—rather than ninety-five—miles per hour in the fifty-five zone on the written warning issued to Snow (Citation No. 356735AB).

47. Trooper Sierra lacked any legitimate reason for not marking the actual speed on Snow's written warning.

48. The common, informal practice of marking a lesser speed than observed to assess a lesser corresponding fine on an issued citation is not applicable to a written warning.

49. Trooper Sierra's personal copy of the Snow written warning has appended to it an additional "Officer Comments" field reading: "LIDAR 95 @1284. . . . . ."

50. Trooper Sierra's decision to release Snow with a warning rather than charging him with a speeding offense was based on an arbitrary classification, Snow's affiliation with a governmental entity, the Middlesex County Sheriff's Office.

51. In exercising some selectively in declining to charge Snow, Trooper Sierra was not acting in furtherance of a purpose consistent with the public interest but instead with a discriminatory intent or purpose.

52. By immediately notifying Snow that he was being recorded, by falsely marking Snow's rate of speed on the written warning, and by minimizing his

interaction with Snow, Trooper Sierra was attempting to secrete his prohibited discriminatory intent or purpose.

53. But for El-Bayeh's lack of apparent (and actual) affiliation with a governmental entity, his alleged speeding violation, which was far less extreme than Snow's, would not have been charged.

54. Snow was, in all relevant aspects, similarly situated to El-Bayeh and yet received favorable treatment that El-Bayeh was arbitrarily denied.

55. No claim for an assessment was made against Snow.

56. Snow was never in peril of suffering collateral administrative penalties or other adverse actions against him, including, but not limited to, the entry of a surchargeable incident into his operator record that would have caused his state-regulated automobile insurance premiums to increase.

57. Snow was never put in a position to claim an appeal or bear the burden of a defense because there was nothing to appeal or defend against.

**Comparator 2 – Blair's Traffic Stop and Warning**

58. On October 2, 2022 at approximately 4:13 P.M., Thomas Blair was operating his motor vehicle on Route 2 in Littleton when Trooper Sierra activated his cruiser's blue lights and sirens and stopped Blair's vehicle.

59. The entire traffic stop was recorded by Trooper Sierra's BWC and CMC.

60.  In connection with a related state court filing discussed *infra*, the BWC footage was uploaded to YouTube where it remains available to view as of the submission date of this Complaint at URL https://youtu.be/v_x2Yy2sI4I.

61.  After effectuating the traffic stop, Trooper Sierra exited his cruiser and approached the passenger's side window of Blair's vehicle.

62.  Once he reached Blair's vehicle, Trooper Sierra was able to observe Blair wearing a baseball cap embroidered with "LFD."

63.  Trooper Sierra requested Blair's license and registration and advised him that he was being recorded on body and cruiser camera.

64.  Blair handed Trooper Sierra the requested items.

65.  Trooper Sierra asked Blair where he worked, to which Blair responded "Lincoln Fire Department."

66.  Trooper Sierra informed Blair that he was being stopped for driving eighty-six miles per hour in a fifty-five zone and again advised him that he was being recorded.

67.  Trooper Sierra returned to his cruiser.

68.  After generating and printing the written warning, Trooper Sierra returned Blair's items and released him.

69. At no point during the stop did Blair offer a reason or excuse for driving eighty-six miles per hour, nor was any apparent.

70. At no point during the stop did Trooper Sierra ask Blair why he was driving eighty-six miles per hour.

71. Trooper Sierra had the sole prosecutorial discretion to charge Blair with a speeding offense or release him with a warning based on his belief that he had developed probable cause.

72. Trooper Sierra elected to release Blair with a warning.

73. Trooper Sierra falsely marked sixty-five—rather than eighty-six—miles per hour in the fifty-five zone on the written warning issued to Blair (Citation No. 619087AB).

74. Trooper Sierra lacked any legitimate reason for not marking the actual speed on Blair's written warning.

75. The common, informal practice of marking a lesser speed than observed to assess a lesser corresponding fine on an issued citation is not applicable to a written warning.

76. Trooper Sierra's personal copy of the Blair written warning has appended to it an additional "Officer Comments" field reading: " 86 MPH in LL."  LL is an abbreviation for left lane.

77. Trooper Sierra's decision to release Blair with a warning rather than charging him with a speeding offense was based on an arbitrary classification, Blair's affiliation with a governmental entity, the Lincoln Fire Department.

78. In exercising some selectively in declining to charge Blair, Trooper Sierra was not acting in furtherance of a purpose consistent with the public interest but instead with a discriminatory intent or purpose.

79. By repeatedly notifying Blair that he was being recorded and by falsely marking Blair's rate of speed on the written warning, Trooper Sierra was attempting to secrete his prohibited discriminatory intent or purpose.

80. But for El-Bayeh's lack of apparent (and actual) affiliation with a governmental entity, his alleged speeding violation, which was far less extreme than Blair's, would not have been charged.

81. Blair was, in all relevant aspects, similarly situated to El-Bayeh and yet received favorable treatment that El-Bayeh was arbitrarily denied.

82. No claim for an assessment was made against Blair.

83. Blair was never in peril of suffering collateral administrative penalties or other adverse actions against him, including, but not limited to, the entry of a surchargeable incident into his operator record that would have caused his state-regulated automobile insurance premiums to increase.

84. Blair was never put in a position to claim an appeal or bear the burden of a defense because there was nothing to appeal or defend against.

**Supporting Pattern Evidence**

85. The Merit Rating Board is a component of the RMV responsible for maintaining operator records, histories, and such other data as it deems necessary and appropriate pertaining to motor vehicle violations.

86. Massachusetts police departments, including MSP, are required to report all issued citations and written warnings to the Merit Rating Board within six business days.

87. Officer Comments which appear on a police officer's copy of a citation or written warning are not transmitted to the RMV, and thus, unlike the reported citation fields, they cannot easily be reviewed in bulk in an electronic spreadsheet column and must be obtained piecemeal from MSP.

88. On or before October 21, 2024, Trooper Sierra caused 421 written warnings that he had issued to be reported to the Merit Rating Board pertaining to violations occurring between July 1, 2019 and October 15, 2024 for Offense Description "SPEEDING RATE OF SPEED EXCEEDING POSTED LIMIT c90 §17" where a non-zero value was reported for Posted Speed.

89. The largest difference reported between reported violator speed and the posted speed limit out of the 421 written warnings was a single written warning for thirty-three miles per hour over the posted speed limit.

90. Only two written warnings out of the 421, or 0.48%, were reported as written for thirty-one over or greater.

91. For the 421 written warnings, the mean difference between reported violator speed and posted speed limit, rounded to the nearest whole number, is sixteen miles per hour over and the median is fifteen.

92. Examined in the context Trooper Sierra's historical pattern and practice of exercising discretion to issue warnings for suspected speeding violations in lieu of citations, it is a reasonable inference that Trooper Sierra's decisions to issue warnings to Snow and Blair were irregular.

93. It is also a reasonable inference that a decision to issue a warning to El-Bayeh would not have been unusual in the context of Trooper Sierra's typical exercise of discretion.

**Undiscovered Discoverable Evidence**

94. On information and belief, MSP is the possession, custody, or control of as of yet undiscovered evidence related to traffic stops for suspected speeding offenses by Trooper Sierra that is potentially relevant to El-Bayeh's claims.

95. This evidence includes, but is not limited to, written warnings and spoiled, mutilated, or voided citations issued by Trooper Sierra that include alleged speeding offenses, including any Officer Comments or other related narrative documentation of the circumstances and events related to said written warnings or citations.

96. This evidence includes, but is not limited to, BWC and CMC footage documenting any traffic stop by Trooper Sierra where said stops were motivated, in whole or in part, by a suspected speeding offense, and where said stops did not result in issuance of a citation or resulted in the issuance of a citation that was subsequently spoiled, mutilated, or voided.

97. This evidence includes, but is not limited to, any other records documenting traffic stops by Trooper Sierra where said stops were motivated, in whole or in part, by a suspected speeding offense, and where said stops did not result in issuance of a citation or resulted in the issuance of a citation that was subsequently spoiled, mutilated, or voided.

98. This evidence includes, but is not limited to, any records documenting referrals or complaints by other law enforcement members or third-parties to Trooper Sierra, as well as records documenting any resulting investigation thereof, where said referrals or complaints were motivated, in whole or in

part, by a suspected speeding offense, whether or not said referrals or complaints resulted in the issuance of a citation.

99. This evidence includes, but is not limited to, any records related to proceedings under G. L. c. 90C, § 3 (hereinafter "CMVI Appeals") where the underlying citation issued by Trooper Sierra includes alleged speeding offenses, including, but not limited to, hearing notices, records of dispositions, and any other evidence or materials related to the prosecution or adjudication of said appeals.

100. El-Bayeh's access thus far to potentially relevant evidence that falls under the category of public records under state law has been obstructed by MSP's repeated violations of state public records law, particularly with regard to statutorily prescribed deadlines for responding to public records requests, as well as by MSP's disobedience of orders issued by the Supervisor of Records in response to related administrative appeals filed by El-Bayeh.

## State Court Proceedings

101. CMVI Appeals are noncriminal and *sui generis* and have a limited function, the determination of responsibility for civil motor vehicle infractions.

102. CMVI Appeals are the sole proceedings available to individuals accused of civil motor vehicle infractions under state law.

103. The procedure for the determination of responsibility for civil motor vehicle infractions is governed by Trial Court Rule VII: Uniform Rules on Civil Motor Vehicle Infractions, which states in pertinent part that the "rule shall be construed and applied to secure the prompt and informal determination of civil motor vehicle infractions."

104. Per the statute and the Rule, there is no general pretrial right to discovery and disclosures or the full complement of discovery methods available in ordinary civil or criminal proceedings. Discovery is narrowly limited to specific written documents or materials in the possession of the police officer or agency concerned that are essential and relevant to the violator's defense to responsibility on a showing of need.

105. Per the statute and the Rule, if a police department shows by preponderance of the credible evidence that a violator committed the infraction alleged, the presiding magistrate or justice must enter a finding of responsible.

106. Per the statute and the Rule, dismissal is not a permitted disposition.

107. Per the statute, review in the nature of certiorari by a civil action is expressly prohibited.

108. Collateral defenses, constitutional or otherwise, that do not turn on the responsibility of the accused for the infraction alleged, or are dispositive in favor the accused notwithstanding a finding based on a preponderance of the

credible evidence that the accused committed the infraction alleged, are not contemplated or permitted by CMVI Appeal procedures.

109. Following the August 4, 2021 traffic stop, El-Bayeh timely claimed his exclusive right to a remedial action, a CMVI Appeal, to contest responsibility for the alleged infraction.

110. El-Bayeh caused the state court proceedings to initiate by paying the required $25 court filing fee to the RMV.

111. A case was opened in the Woburn District Court under docket no. 2153MV000407 and a Virtual Magistrate Hearing was held on December 9, 2021.

112. After hearing, the magistrate found El-Bayeh responsible and imposed an assessment of $105.  At the conclusion of the hearing, El-Bayeh claimed a *de novo* appeal to a judge and paid the $50 fee.

113. A *de novo* judge hearing was held in the Woburn District Court on May 20, 2022.  At the conclusion of the *de novo* hearing, the judge found El-Bayeh responsible and imposed an assessment of $105.

114. El-Bayeh timely filed his Claim of Appeal to the Appellate Division of the District Court Department on May 31, 2022.  The case was entered in the Appellate Division under Case No. 22-ADCI-65NO on July 5, 2022.

115. After El-Bayeh submitted a brief, the Appellate Division summarily affirmed the trial court's finding of responsible on April 6, 2023.

116. On June 2, 2023, El-Bayeh timely filed his Notice of Appeal to the Appeals Court.  On June 12, 2023, the case was entered in the Appeals Court under docket no. 2023-P-0675.

117. On the same day, El-Bayeh moved for a stay of appellate proceedings due to the pendency of a related case, briefly discussed below.

118. The related case commenced on September 21, 2021 when El-Bayeh filed his Civil Action and Complaint in the Middlesex County Superior Court.

119. On June 9, 2022, the Superior Court accepted the superseding First Amended Complaint ("FAC") on El-Bayeh's motion, which became the operative complaint for the remainder of the litigation.

120. The FAC named as defendants the Massachusetts Department of Transportation ("MassDOT") and MSP, several officials thereof in their individual and official capacities, as well as Trooper Sierra in his individual capacity.

121. The FAC alleged that the fifty-five mile per hour speed limit on U.S. Route 3 was unlawfully promulgated and unenforceable and sought related declaratory and injunctive relief against agency and official capacity

defendants.  The FAC also alleged civil rights and tort claims against individual capacity defendants.

122. The Superior Court entered a judgment dismissing all claims in the FAC on April 13, 2023.  El-Bayeh then timely filed his Notice of Appeal from the judgment to the Appeals Court.  On May 26, 2023, the case was entered in the Appeals Court under docket no. 2023-P-0618.

123. In his June 12, 2023 motion to stay the CMVI action in the Appeals Court, El-Bayeh argued that because the Superior Court action pending on appeal had the potential to impact his defense in the CMVI action, the CMVI action should be stayed until the final disposition of the Superior Court action.

124. The Appeals Court summarily granted the stay, which ultimately remained in effect until January 10, 2025.

125. On July 24, 2024, the Appeals Court issued an unpublished memorandum and order affirming the dismissal of the FAC.  El-Bayeh v. Mass. Dep't of Transp. & others, 104 Mass. App. Ct. 1115 (2024) (Rule 23.0 decision).

126. On July 22, 2024, two days before the decision of the Appeals Court issued and without prior notice to El-Bayeh, MassDOT erected new sixty-five mile per hour speed limit signs along the entire length of U.S. Route 3 and issued a press release informing the public of the increase in the speed limit from fifty-five to sixty-five miles per hour.

127. On July 23, 2024, El-Bayeh submitted a public records request to MassDOT for records related to the deliberative process and ultimate decision to post the sixty-five mile per hour speed limit signs on U.S. Route 3.

128. In response, MassDOT provided, among other records, a copy of the Appeals Court memorandum and order as well as a privilege log documenting the substance of withheld email exchanges between various government attorneys and MassDOT employees concerning El-Bayeh's litigation.

129. On September 20, 2024, El-Bayeh filed his Application for Leave to Obtain Further Appellate Review with the Supreme Judicial Court under docket no. FAR-29952.

130. On November 14, 2024, appellate review of Superior Court action was exhausted with no relief granted upon the Supreme Judicial Court's denial of El-Bayeh's application.

131. Facing the imminent resumption of proceedings and the apparent nonviability of his other anticipated ground for postjudgment relief in the CMVI action, El-Bayeh decided in his discretion to make a good-faith attempt to first raise and resolve the selective prosecution defense in state court, despite his doubts about the capacity of a state court to entertain the defense or grant the remedy of dismissal.

132. On January 31, 2025, El-Bayeh filed his Defendant-Appellant El-Bayeh's Renewed and Amended Motion to Stay Appellate Proceedings Pending Disposition of Motion for Evidentiary Hearing on Motion for Vacatur and Dismissal and Motion for Discovery Order and related Affidavit and Exhibits.  True and correct copies of the motion, affidavit, and exhibits are attached hereto and the facts therein are incorporated by reference as Exhibits 1, 2, and 3 respectively.

133. On January 4, 2025, in its Appellee Massachusetts Department of State Police's Objection and Response to Appellant's Request for Stay, a pleading filed in response to the first iteration of the motion described in the preceding paragraph, an attorney for MSP expressed doubts about raising a selective prosecution defense in district court proceedings.  A true and correct copy of the filing is attached hereto as Exhibit 4.

134. MSP did not file a response to the subsequent January 31 motion.

135. On February 5, 2025, a Single Justice of the Appeals Court summarily denied the motion to stay.

136. On February 6, 2025, the Single Justice summarily denied El-Bayeh's Motion for Findings and Conclusions on the February 5 order.

137. A true and correct copy of the Appeals Court docket showing the entries as of the submission date of this Complaint is attached hereto as Exhibit 5.

- 23 -

**State Enforcement Mechanisms**

138. By operation of law, payment of the assessment and thereby any adverse collateral consequences are stayed during the pendency of any CMVI Appeal, including any review by an appellate court.

139. El-Bayeh's CMVI Appeal remains pending in the Appeals Court as of the submission date of this Complaint.

140. If the Appeals Court were to render a decision that is adverse to El-Bayeh that El-Bayeh did not further appeal, or if El-Bayeh were to exhaust any further appeals without obtaining a favorable decision, he would be obligated to pay to the Registrar the full amount of the imposed assessment within twenty days.

141. Under state law, the government has both an administrative and judicial enforcement mechanism available to coerce remittance of the assessment.

142. Under the administrative mechanism, if El-Bayeh were to fail to pay the full amount within the time allowed, the Registrar would revoke any operator's license, learner's permit, certificate of registration or title, number plate, sticker, decal or other item issued by the Registrar and held by El-Bayeh and order the return thereof forthwith.

143. Under the judicial mechanism, a judge of the district court may issue, at the request of the District Attorney or police prosecutor or clerk-magistrate, or

*sua sponte*, a complaint for civil contempt for failure or refusal to pay the imposed assessment. Such proceedings for civil contempt are prosecuted by the District Attorney or police prosecutor.

## CAUSE OF ACTION

## COUNT I: SELECTIVE ENFORCEMENT

144. Plaintiff incorporates and re-alleges each and every allegation contained in paragraphs 1 through 143 as if fully set forth herein.

145. Count I is brought pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

146. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1.

147. In their enforcement of the traffic laws against El-Bayeh, Defendants MSP and/or Sierra have selectively treated El-Bayeh unfavorably by charging him with a speeding offense and thereby claiming an assessment and collateral penalties against him while other similarly situated individuals were only given warnings.

148. Defendants MSP and/or Sierra's adverse treatment of El-Bayeh and favorable treatment of other similarly situated individuals was based on an arbitrary classification—affiliation with a governmental entity.

- 25 -

149. Defendants MSP and/or Sierra have thus, under color of law, subjected, or caused to be subjected, El-Bayeh to the deprivation of his right to equal protection of the laws.

## COUNT II: SELECTIVE PROSECUTION

150. Plaintiff incorporates and re-alleges each and every allegation contained in paragraphs 1 through 149 as if fully set forth herein.

151. Count II is brought pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

152. In commencing and continuing a prosecution of the alleged traffic violation against El-Bayeh, Defendants MSP and/or Sierra have and continue to selectively treat El-Bayeh unfavorably given that prosecutions of other similarly situated individuals were forgone.

153. Defendants MSP and/or Sierra's adverse treatment of El-Bayeh and favorable treatment of other similarly situated individuals was based on an arbitrary classification—affiliation with a governmental entity.

154. Defendants MSP and/or Sierra have thus, under color of law, subjected, or caused to be subjected, El-Bayeh to the deprivation of his right to equal protection of the laws.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.  An entry of judgment declaring that El-Bayeh has been
    unconstitutionally subjected to an act of selective enforcement;

B.  An entry of judgment declaring that El-Bayeh has been
    unconstitutionally subjected to an act of selective prosecution;

C.  A permanent injunction prohibiting Defendants from taking any further
    enforcement or prosecutorial action against El-Bayeh, whether directly
    or collaterally, arising from the alleged August 4, 2021 speeding
    violation;

D.  Awards of nominal, compensatory, punitive, and exemplary damages
    against Defendant Sierra;

E.  Costs;

F.  All further legal and equitable relief as necessary to effectuate the
    Court's judgment, or as the Court otherwise deems just and proper.

Plaintiff demands trial by jury on all issues so triable.

Respectfully Submitted,

/s/ Mikhael El-Bayeh

_____

Mikhael El-Bayeh
10 Dewey Ave
Woburn, MA 01801
*pro se*
508-789-2605
mikhael.e@gmail.com

Date: February 26, 2025